IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| HENRY GREEN, | :: | |
| Movant, | :: | CRIMINAL ACTION |
| | :: | NO. 1:02-CR-585-5-BBM |
| v. | :: | |
| | :: | CIVIL ACTION NO. |
| UNITED STATES OF AMERICA, | :: | 1:07-CV-2110-BBM |
| Respondent. | :: | |

### O R D E R

Movant Henry Green ("Mr. Green"), by and through counsel, seeks via 28 U.S.C. § 2255 to vacate the 144-month sentences he received for his December 8, 2003, conviction of conspiracy to distribute and possess with intent to distribute at least 5 kilograms of a mixture containing a detectable amount of cocaine and at least 1000 kilograms of a mixture containing a detectable amount of marijuana, and his conviction of distributing at least 100 kilograms of a mixture containing a detectable amount of marijuana.  The matter is before this Court on the motion to vacate, set aside, or correct sentence [Doc. 546] and the Government's answer-response to the § 2255 motion to vacate sentence [Doc. 551].

## I.    Procedural Background

On November 13, 2003, a federal grand jury sitting in the Northern District of Georgia returned a superceding indictment charging Mr. Green with conspiracy to distribute and possess with intent to distribute cocaine and at least 1000 kilograms

of a mixture containing a detectable amount of marijuana, in violation of 21 U.S.C. § 846 and 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(vii) (Count One), and distribution of at least 100 kilograms of a mixture containing a detectable amount of marijuana on or about December 5, 2001, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vii) and 18 U.S.C. § 2 (Count Two). (Doc. 258 at 1-2). On December 1-8, 2003, a jury trial was held, and at the conclusion of the trial, the jury returned a verdict of guilty on both counts.  (Docs. 310-324).

On June 2, 2004, this Court sentenced Mr. Green to 235 months' imprisonment on each count to be served concurrently and to be followed by five years of supervised release. (Doc. 427).  Also in June 2004, Mr. Green appealed his sentences to the United States Court of Appeals for the Eleventh Circuit.  United States v. Green, Case No. 04-12977.  On April 25, 2006, the Eleventh Circuit Court of Appeals held that, pursuant to Booker v. United States, 543 U.S. 220 (2005) and Blakely v. Washington, 542 U.S. 296 (2004), this Court violated the Sixth Amendment by finding that Mr. Green's crimes involved a quantity of drugs that was greater than the amount found by the jury.  Green, Case No. 04-12977 at 4-5.  (Doc. 526). Consequently, Mr. Green's sentence was vacated and his criminal case was remanded to this Court for re-sentencing.  Id. at 6.  On August 31, 2006, Mr. Green

was re-sentenced to 144 months on each count, to be served concurrently, and all other aspects of the Judgment of June 2, 2004, remained unchanged.  (Doc. 536).

On August 30, 2007, this Court received the instant 28 U.S.C. § 2255 motion to vacate, set aside, or correct sentence.  (Doc. 546).  In support of the instant motion to vacate sentence, Mr. Green contends that his trial counsel, Dwight Lowell Thomas,[1] rendered "ineffective assistance in both the investigation of the defense case and in the trial of this case."  (Id. at 4).  Specifically, trial counsel was allegedly ineffective by (1) failing to cross-examine adequately certain Government witnesses, (2) failing to call essential defense witnesses, (3) failing to prepare adequately for trial, and (4) failing to pursue a guilty plea, pursuant to North Carolina v. Alford, 400 U.S. 25 (1970).[2]  (Doc. 551 at 6-18, 24-29).

---

[1] Mr. Thomas was assisted at trial by attorney Teri L. Thompson.

[2] Mr. Green raised his first three claims of ineffective assistance of trial counsel in his motion for new trial which was filed on June 2, 2004.  (Doc. 428).  This Court did not review the merits of these claims.  (Doc. 438).  Instead, this Court found that Mr. Green failed to file his motion for new trial within seven days, as required by Fed. R. Crim. P. 33(b)(2), and he was not entitled to the newly discovered exception to this limitation provided in Fed. R. Crim. P. 33(b)(1). (Doc. 438 at 3-11).  Subsequently, on June 10, 2004, Mr. Green filed both a motion to re-characterize his motion for new trial as a 28 U.S.C. § 2255 motion to vacate, set aside or correct sentence and a separate 28 U.S.C. § 2255 motion to vacate, set aside, or correct sentence in which he raised the same four allegations of ineffective assistance of counsel presently before this Court.  (Docs. 440-41).  However, because Mr. Green was simultaneously appealing his convictions, this Court was without jurisdiction to review those motions and dismissed them on that basis.  (Doc. 453).

On October 1, 2007, the Government filed its answer-response.  (Doc. 551).
The Government contends that Mr. Green's claims of ineffective assistance of trial
counsel are without merit, and consequently, Mr. Green's § 2255 motion to vacate
sentence should be denied.  (Id. at 11).

## II.   <u>Evidence at Trial</u>

Relevant to Mr. Green's claims of ineffective assistance of trial counsel, there
was considerable evidence of Mr. Green's guilt presented during the trial.  Mr.
Green's counsel also vigorously cross-examined the Government's witnesses, and
presented a defense.  A summary of the evidence, counsel's attempt to discredit the
Government's witnesses, and Mr. Green's defense will be helpful in resolving Mr.
Green's claims of ineffective assistance of trial counsel.

### A.   <u>Government Witnesses</u>

#### 1.   <u>Ronald Knight</u>[3]

Ronald Knight, who was arrested in September of 2002,  testified that he was
distributing marijuana and cocaine for as long as 12 years, and during the latter
years, his was a "major involvement with my [drug distribution] organization."
(Doc. 411 at 239, 245).  Knight stated that he obtained the drugs from connections in
south Texas and Mexico, and the drugs were brought to Atlanta by tractor trailer.

---

[3]<u>United States v. (Ronald) Knight</u>, Case No. 1:02-CR-585-1-BBM.

(Id. at 240-41).  To assist him in his drug operation, Knight arranged to have Corey Lewis and another individual handle the unloading of the tractor trailers.  (Id. at 260-62).  Concerning a drug shipment in November of 2001, Lewis informed Knight that the tractor trailer would be unloaded at Mr. Green's place of business.  (Id. at 277-81).  Knight arrived at Mr. Green's business to determine the quantity of drugs that had been delivered, and at that time, Lewis introduced him to Mr. Green.  (Id. at 281).  Knight testified that his brother, Byron Knight, and Corey Lewis told him that Mr. Green assisted in the unloading of the cocaine by providing certain tools needed to access the cocaine and permitting the cocaine to be stored at his business overnight.  (Id. at 283-84).  Knight stated that Lewis was supposed to pay Mr. Green for the use of his business.  (Id. at 284-85).  Knight also stated that Byron Knight was at Mr. Green's place of business to assist in the unloading of the tractor trailer.  (Id. at 282).  When the cocaine was moved to a warehouse and distributed, Lewis and other individuals obtained a share of the cocaine.  (Id. at 286-87).

According to Knight, on the night of December 5, 2001, a tractor trailer containing marijuana was unloaded at Mr. Green's business.  (Id. at 316-17).  A recorded telephone conversation between Knight and Lewis also indicated that the tractor trailer containing the marijuana arrived at Mr. Green's business, and in a recorded phone call from Byron Knight, Ronald Knight learned that Mr. Green

would not be able to store the marijuana overnight.  (Id. at 318-19).  Knight had

another individual, who was driving a maroon Silverado, follow him to Mr. Green's

location to load the marijuana, and Lewis left to obtain an additional truck.  (Id. at

320-21). Later that evening, Byron Knight, who was now driving the Silverado, was

arrested and approximately 750 pounds of marijuana was recovered from the truck.

(Id. at 324).  Lewis, who was driving the other truck filled with marijuana, was not

arrested at that time.  (Id.).

During cross-examination by Mr. Green's attorney, Knight acknowledged

only meeting Mr. Green in November of 2001.  (Id. at 405).  Using Knight's

statements when he was debriefed, Mr. Green's counsel attempted to show that

Knight's memory was vague about the location where the tractor trailers were

unloaded. (Id. at 413-17).  Counsel also attempted to imply by way of certain

questions that Mr. Green would not have known from either Knight or Lewis that

the tractor trailers contained cocaine and marijuana. (Id. at 417-20, 437-40).  Further,

counsel reviewed Knight's plea agreement in an effort to show the jury the benefits

he received by testifying against Mr. Green and the other co-defendants. (Id. at 421-

31).  Counsel also attempted to show that it was Knight, and not Mr. Green, who

provided the tools to help unload the tractor trailer by reviewing statements Knight

purportedly made which were placed in his pre-sentence investigation report

("PSR").  (Id. at 431-34).  However, during re-direct, Knight stated that there was no question in his mind that he met Mr. Green, used's Mr. Green's place of business, and that Knight was not the one who provided the tools to help unload the tractor trailer.  (Id. at 450-53).

       2.   Corey Lewis[4]

Corey Lewis testified that his role in the drug trafficking business was as a seller and a transporter, and that he used his own tractor trailer to drive marijuana and cocaine from south Texas to Atlanta and other major cities.  (Id. at 464-65). Lewis stated that Mr. Green was involved in the illicit drug conspiracy.  (Id. at 459). Lewis claimed to be Mr. Green's friend, and that is why Lewis asked to use his place of business to unload the tractor trailers.  (Id. at 472).  Lewis testified that he sold cocaine to Mr. Green's cousin, who was from South Carolina, Mr. Green would witness the transactions, and Mr. Green would participate in the transactions by taking the cocaine to his cousin and by paying Lewis for the cocaine.  (Id. at 474-75). Lewis stated that Mr. Green knew that Lewis was "shipping drugs."  (Id. at 475). With regard to the events in November of 2001, Lewis described in considerable detail how he (1) contacted Mr. Green on Knight's behalf; (2) informed Mr. Green that the tractor trailer would be carrying illicit drugs; (3) obtained Mr. Green's

_____

[4]United States v. Lewis, Case No. 1:02-CR-585-3-BBM.

assistance in moving certain tools so the tracker trailer could enter the unloading bay; (4) obtained Mr. Green's assistance in removing the door of the tractor trailer, using his tools in order to remove the cocaine from the door; (5) observed Mr. Green meeting Ronald and Byron Knight and Mr. Green agreeing to allow the cocaine to be stored overnight; (6) obtained Mr. Green's help in loading the cocaine into a station wagon the next morning; and (7) paid Mr. Green for allowing the tractor trailer to be unloaded at his business.  However, despite Mr. Green's request, Lewis did not pay him for allowing the cocaine to be stored overnight at his place of business.  (Id. at 480-91).

According to Lewis, because Mr. Green was not paid for storing the cocaine overnight, he informed Lewis that he would not permit the December 5, 2001, marijuana shipment to stored at his business overnight.  (Id. at 497-98).  Lewis also identified himself and the voice of Ronald Knight in a recorded conversation discussing Mr. Green's decision regarding overnight storage.  (Id. at 498).  The remainder of Lewis's direct testimony concerned Mr. Green's co-defendants.

On cross examination, Mr. Green's counsel attempted to discredit Lewis by having him acknowledge that his 10-year sentence may be reduced by testifying against Mr. Green and the other co-defendants.  (Id. at 529-31).  Additionally on cross-examination, Lewis admitted that the Government granted him immunity

with regard to his involvement in other illegal activities in return for his cooperation during his debriefing.  (Id. at 531-34).  Mr. Green's counsel also elicited testimony from Lewis concerning (1) his three prior convictions; (2) the fact that he avoided a possible life sentence as a result of those convictions by cooperating with the Government; (3) his involvement in drug trafficking since he was sixteen; (4) that he lied to Ronald Knight when he told Ronald Knight that the police had obtained the marijuana Lewis had in his possession on December 5, 2001; (5) that one of the charges against him was dropped in exchange for pleading guilty; and (6) that he had previously violated his terms of probation with regard to a conviction in DeKalb County, Georgia.  (Id. at 535-97).

On cross-examination, Lewis also denied that he testified during his direct examination that Mr. Green helped them unload the cocaine.  (Id. at 567).  At the close of trial, this Court read the portion of the transcript where Lewis stated on direct that Mr. Green helped "move stuff out of the way," and that Lewis and Ronald Knight "left once they took the doors off."  (Id. at 981-982).

### 3.   Roy Bridges

Roy Bridges was employed as a mechanic's helper for Mr. Green when the tractor trailer drug deliveries were made, and Bridges was aware of those deliveries. (Id. at 605, 609).  Bridges, who spent the night at Mr. Green's shop during the work

week, was told to remain in the office after one of the tractor trailers arrived, and Mr. Green locked him in that office.  (Id. at 609-12).  Mr. Green later unlocked the office, went home, and Bridges spent the night at the shop.  (Id. at 613-14).  The next morning, Mr. Green showed Bridges the cocaine stored in two automobiles (including a Mustang), described to him that the cocaine had been stored in the tractor trailer's doors, and he then had Bridges stay in the shop area until the cocaine had been picked up.  (Id. at 616).

Bridges testified that a couple of weeks later Mr. Green told him a tractor trailer was arriving, and because Mr. Green would not be there at the time of the arrival, told Bridges to open the gate and to let the truck inside.  (Id. at 616-17).  Additional people, who Bridges did not know, came to Mr. Green's business after the tractor trailer arrived.  (Id. at 620-21).  Later that night, the police arrived, arrested the four Mexicans who drove the tractor trailer and other, unspecified individuals, and questioned Bridges.  (Id. at 626).  Bridges was not arrested, and he spent the night at the shop.  (Id. at 627).

During cross-examination, Bridges admitted to using crack cocaine and stealing from a previous employer to pay for his drug use.  (Id. at 630).  Bridges also admitted to using crack, mostly on weekends, while employed by Mr. Green.  (Id. at 633).  Counsel attempted to impeach Bridges by trying to have him admit that he

previously told co-counsel that he "guessed" Mr. Green was there when the tractor trailer carrying the cocaine arrived in November of 2001. (Id. at 637-38). Bridges did acknowledge that he never saw Mr. Green "touch any drugs." (Id. at 640). Bridges also admitted that he been drinking considerably and had used crack cocaine on the evening of December 5, 2001. (Id. at 641). Further, Bridges stated that he never smoked crack cocaine in Mr. Green's presence, and Mr. Green never encouraged him to use crack cocaine or offered to provide him the drug. (Id. at 642).

Counsel also elicited testimony from Bridges that (1) he did not know the color of the two vehicles used to pickup the marijuana or see the drivers of them; (2) it was not unusual for the business to be open as late as 11:00 P.M.; and (3) he initially told the police that Mr. Green was not involved in the drug deliveries, but later told the police that Mr. Green must be involved because he lets them onto the premises. (Id. at 645-50). Counsel reviewed discrepancies between Bridges's statements to police and his testimony at trial. (Id. at 650-51). That review forced Bridges to admit that (1) he did not remember much of what he told the police because he was intoxicated and confused; (2) the Government promised not to prosecute him, if he cooperated; and (3) the police did not find any marijuana or cocaine when they searched Mr. Green's business. (Id. at 651-57).

-11-

4.   Lori Price

Price, the United States Probation Officer who prepared Ronald Knight's "PSR," testified that Knight told her that he "provided the tools needed to remove the cocaine from the vaults compartment located in the trailer." (Id. at 664). However, according to the D.E.A. 6 Report, Knight told investigators that Mr. Green supplied the tools. (Id. at 665-66). Price stated that the D.E.A. report was correct and the PSR she prepared was not. (Id. at 670-71).

5.   Byron Knight[5]

Byron Knight stated that he pled guilty to conspiracy to distribute cocaine and marijuana, and that he received a 48-month sentence. (Id. at 680). Byron Knight also acknowledged that the Government might seek to have his sentence lowered in exchange for his cooperation and testimony. (Id. at 681). Byron Knight, who is Ronald Knight's brother, admitted that he helped unload the cocaine delivered in November of 2001. (Id. at 684). Byron Knight stated that while unloading, Corey Lewis and Mr. Green were there, and that Mr. Green opened the garage door to let the tractor trailer inside the building. (Id. at 685-86). Byron Knight also stated that Mr. Green "gave him some tools to open the trailer doors." (Id. at 686). Byron Knight testified that he, Lewis, Mr. Green and the driver of the tractor trailer loaded

---

[5]United States v. (Byron) Knight, Case No. 1:02-CR-585-2-BBM.

the cocaine into two automobiles.  (Id. at 688).  Byron Knight also described the delivery of the marijuana, the unloading of the marijuana from the tractor trailer into two pickup trucks, and stated that he did not see Mr. Green on the night the marijuana delivery was made.  (Id. at 691-95, 718-21).

On cross-examination, Byron Knight acknowledged that, sometime in 2002, his brother, Ronald Knight, provided him with a home and a nurse to help care for him.  (Id. at 724).  Byron Knight also admitted that he was taking three types of mental health medications and suffered from depression, paranoia and possibly schizophrenia.  (Id. at 728, 730).  However, Byron Knight was not receiving his medicine during the trial because the nurse at U.S.P. Atlanta had already left by the time he was returned to the prison.  (Id. at 729).  During the remainder of cross-examination, Mr. Green's counsel focused on Byron Knight's mental health issues.  (Id. at 731-36).  At the close of trial, this Court informed the jury that Arlene Barnick, a Licensed Certified Social Worker, stated in a letter dated April 29, 2001, that she "believes that Byron Knight is unable to advocate for himself."  (Id. at 979).

### 6.    R.J. Brink and Anthony McCrorey

Brink is a DeKalb County Police Officer who assisted the D.E.A. in the surveillance and December 2001 arrests, and his testimony was not related to Mr. Green's involvement.  (Id. at  742-66).  McCrorey is a Special Agent for the D.E.A.

who handled over fifty (50) narcotic delivery investigations and had considerable experience with tractor trailer drug shipments. (Id. at 766-68). McCrorey described his investigation which led to the December 2001 arrests. (Id. at 769-808). McCrorey identified Mr. Green's place of business as the location of the marijuana delivery. (Id. at 793-94). On cross-examination, McCrorey acknowledged that Corey Lewis, whose phone was wire-tapped, was using a "clone phone." Based on this testimony, Mr. Green's counsel attempted to show that the wire-tapped clone phone was actually using a different phone number due to Corey Lewis replacing the memory chip of his phone with the chip from another phone. (Id. at 809). McCrorey also acknowledged that he had not debriefed Byron Knight , but only talked with him, and that conversation occurred just prior to trial with the Government's counsel present during the conversation. (Id. at 830-31).

    B.    <u>Defense Witnesses</u>

        1.    <u>Jeffrey Pollard</u>

Pollard, who worked in the trucking business, testified that he had known Mr. Green for over ten (10) years and had worked with him before. (Id. at 872-74). Significantly, Pollard testified that he had previously fired Roy Bridges because he stole money in order to purchase crack cocaine. (Id. at 874). Pollard characterized Bridges's reputation for truthfulness as "awful," and that he would "absolutely not"

-14-

believe his testimony under oath.  (Id. at 876-77).  Under cross-examination, Pollard

stated that he would expect Mr. Green to run a "respectable operation."  (Id. at 878).

### 2.   Willys Fahie

Fahie worked for Mr. Green and knew both Corey Lewis and Roy Bridges.

(Id. at 880-82).  Fahie stated that Lewis had two or three cars, including his

girlfriend's car, repaired at Mr. Green's business.  (Id. at 881-82).  Fahie also testified

that she saw Bridges and Lewis talking together on "many occasions" when Mr.

Green was "not around."  (Id. at 883).

### 3.   Ron Edmonds

Edmonds was employed by Mr. Green as a mechanic.   (Id. at 885-86).

Edmonds characterized Mr. Green as "a good guy."  (Id. at 886).

### 4.   Mr. Green — Henry Green

Mr. Green testified that he had been involved in engine repair work for 31

years, and until this case, had never been arrested, and his worst criminal conduct

involved parking and speeding tickets.  (Id. at 889-91).  Mr. Green stated that Corey

Lewis never sold drugs to Mr. Green's cousin, that he does not have a cousin in

Georgia, and he never saw Lewis sell drugs.[6]  (Id. at 892-93).  Mr. Green also testified

---

[6]Lewis testified that he sold drugs to Mr. Green's cousin, who Lewis thought was
from South Carolina.  (Doc. 412 at 475).  Thus, the court is unaware of the significance of
Mr. Green's testimony that he does not have a cousin in Georgia.  (Doc. 416 at 892).

that Lewis had brought cars to his business to be repaired, but Lewis did not pay him for the last car that was repaired or return Mr. Green's phone calls. (Id. at 896-97). Mr. Green stated that he did not know Lewis "was hauling dope" or "cocaine." (Id. at 901-02).

Mr. Green testified that he had "to stay on him [Roy Bridges] all the time . . . because it's bad for somebody to smoke crack and waste his life away." (Id. at 907). Mr. Green stated that two or three months prior to the incidents with the tractor trailers he discovered that Bridges, who did not have a key to the office, had been accessing the office through the roof, and Mr. Green believed that Bridges was the one responsible for several missing items in his office. (Id. at 909-10). Mr. Green testified that he never showed Bridges any cocaine, and that Bridges was probably the one who put the cocaine in the red Mustang. (Id. at 910). Mr. Green did not recall talking to Lewis on December 5, 2001, but if Lewis did call him, it was in reference to a vehicle being repaired for Lewis's girlfriend. (Id. at 914-15). Mr. Green denied giving Lewis permission to bring a tractor trailer to the premises on December 5, 2001. (Id. at 915-16). Mr. Green, who was arrested in September 2002, passed all drug tests. (Id. at 916-17). During cross-examination, Mr. Green denied knowing Ronald and Byron Knight. (Id. at 928).

5.   <u>Walter Hubbard</u>

Hubbard owned Cageman Coach Line and leased a portion of his garage to Mr. Green, who used it to operate his business. (<u>Id.</u> at 930-31). Previously, Hubbard had been a DeKalb County Police Officer for 20 years, and his duties included working with the D.E.A. and the Metro Narcotics Squad. (<u>Id.</u>). Hubbard testified that the garage is very large, and he leased portions of it to several companies and four independent truck drivers. (<u>Id.</u> at 932-33). Each of these companies and individual drivers had a key to open the gate to the premises. (<u>Id.</u> at 935). In the early morning hours of December 5, 2001, Hubbard allowed the police to search Mr. Green's business, and they did not find anything illegal. (<u>Id.</u> at 939-40). A couple of days later, Mr. Green told Hubbard he was not involved in these events. (<u>Id.</u> at 941).

## III.   <u>Discussion</u>

A.   <u>The Federal Standard for Evaluating Claims of Ineffective Assistance of Counsel</u>

Mr. Green alleges that trial counsel failed to provide effective assistance, as required by the Sixth Amendment. The federal standard for evaluating ineffective assistance of counsel claims was set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). The analysis is two-pronged. However, a court need not address both of these prongs "if the defendant makes an insufficient showing on one." <u>Id.</u> at 697.

-17-

One asserting a claim of ineffective assistance of counsel must first show that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Id. at 690. A court analyzing Strickland's first prong must be "highly deferential" and must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689; Atkins v. Singletary, 965 F.2d 952, 958 (11th Cir. 1992) ("We also should always presume strongly that counsel's performance was reasonable and adequate . . . ."). "In order to show that an attorney's strategic choice was unreasonable, a petitioner must establish that no competent counsel would have made such a choice." Provenzano v. Singletary, 148 F.3d 1327, 1332 (11th Cir. 1998); see also Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) ("a petitioner seeking to rebut the strong presumption of effectiveness bears a difficult burden"). Put another way, "trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc) (quoting Burger v. Kemp, 483 U.S. 776, 794 (1987)); Sullivan v. Deloach, 459 F.3d 1098, 1108 (11th Cir. 2006) ("purpose of ineffectiveness review is not to grade

counsel's performance"), <u>cert.</u> <u>denied</u>, __ U.S. __, 127 S. Ct. 1821 (2007) (internal quotations and citation omitted).

The second prong of <u>Strickland</u> requires Mr. Green to demonstrate that counsel's unreasonable acts or omissions prejudiced him. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." <u>Strickland</u>, 466 U.S. at 691. To satisfy <u>Strickland</u>'s prejudice prong, Mr. Green "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> at 694; <u>Grayson v. Thompson</u>, 257 F.3d 1194, 1225 (11th Cir. 2001) ("Under the prejudice prong of <u>Strickland</u>, it is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.") (internal quotations and citation omitted); <u>Bennett v. Fortner</u>, 863 F.2d 804, 809 (11th Cir. 1989) (<u>Strickland</u>'s prejudice prong is not satisfied by making speculative allegations of prejudice). Further, even if counsel's performance is deemed unreasonable, overwhelming evidence of guilt will preclude a finding of prejudice. <u>Jones v. Campbell</u>, 436 F.3d 1285, 1300 (11th Cir.) (no prejudice from counsel's failure to present evidence of

mental health problems due to "the overwhelming evidence of Jones's guilt"), cert.

denied, __ U.S. __, 127 S. Ct. 619 (2006).

    B.    Review of Mr. Green's Claims of Ineffective Assistance of Counsel

Mr. Green has alleged four claims of ineffective assistance of trial counsel, and

he further contends that the prejudice-prong of Strickland should be presumed due

to counsel failing "to subject the prosecution's case to meaningful adversarial

testing." United States v. Cronic, 466 U.S. 648, 659 (1984). (Doc. 546 at 20-21). This

Court's previous review of the evidence at trial, and counsel's efforts to impeach the

Government's witnesses, as well as putting forth a defense, prohibit this Court from

relying on Cronic to presume prejudice.

    1.    Failure to Cross-Examine Government Witnesses Effectively

In his first claim of ineffective assistance of trial counsel, Mr. Green contends

that counsel did not adequately cross-examine Government witnesses Roy Bridges,

Corey Lewis, Byron Knight, and Ronald Knight. (Doc. 546 at 6-13). As shown in

Part II, supra, counsel cross-examined all witnesses and attempted, with some

success, to attack the credibility of each. A review of this claim of ineffective

assistance of counsel will show that counsel's performance was neither unreasonable

nor prejudicial.

a.  Witnesses

i.  Roy Bridges

Mr. Green alleges that trial counsel "failed to bring out significant information that would have shown that Bridges fabricated his testimony." (Doc. 546 at 6). This "fabrication" concerns Bridges's statement to the D.E.A. that he heard a U-Haul deliver the cocaine in November 2001, while Lewis testified that he used a station wagon to pick up the cocaine.  (Doc. 546 at 6-7).

First, there is no contradiction.  Bridges, who was inside Mr. Green's office, claimed he could tell it was a U-Haul because "he could hear the big door sliding up."  (Id. at 7).  Bridges's statement concerns the delivery of the cocaine, and it is apparent that the sound of tractor trailer door opening would be similar to that of a U-Haul.  Lewis's testimony was about picking up the cocaine after the tractor trailer had delivered it.  Mr. Green, therefore, is incorrectly seeking to merge two distinct events.  Bridges also acknowledged using crack cocaine and drinking that night. Thus, Bridges inability to distinguish the difference in the sounds these type of doors make when being opened is understandable.

Mr. Green also contends that counsel should have raised on cross-examination that Bridges was never threatened with prosecution, after he testified that he would not be prosecuted if he cooperated with authorities.  (Id. at 7-8).  Had Bridges been

questioned about this minor discrepancy, his credibility would have actually been enhanced because it could be perceived that he was testifying without any pressure from the Government.  Counsel's decision not to go forward with such questioning seems quite reasonable to this Court.

ii.    Corey Lewis

Mr. Green seeks to make much of alleged discrepancies between Lewis's PSR and his trial testimony, and counsel's supposed failure to raise these discrepancies during cross-examination.  Mr. Green notes the following statements Lewis gave the probation officer:  (1) he used Mr. Green's place of business approximately 12 times to deliver drugs; (2) Lewis paid Mr. Green between $1,000.00 and $2,000.00 each time his business was used; (3) Lewis claimed it was his idea to pay Mr. Green a kilo of cocaine for storing the cocaine in November 2001; and (4) Mr. Green offered to store the marijuana on December 5, 2001.  (Doc. 546 at 8).  Mr. Green also alleges that Lewis contradicted the testimony of other Government witnesses when he said that the cocaine was stored in only one car when he returned the next day to Mr. Green's business.  (Id.).  Further, Mr. Green claims that Lewis was inconsistent with his testimony regarding whether Mr. Green gave him permission to unload the tractor trailers or knew when Lewis was hauling drugs.  (Id. at 9).

With regard to the alleged inconsistencies between Lewis's statements contained in the PSR and his testimony at trial, concerning whether Lewis had Mr. Green's permission to unload the tractor trailers and Mr. Green's knowledge about when Lewis was hauling drugs, Mr. Green's counsel made the tactical decision not to address them. Mr. Green does not explain how that decision was unreasonable or prejudicial. In fact, counsel's decision was extremely reasonable, as each of the statements contained in Lewis's PSR show Mr. Green was more involved in the drug distribution conspiracy than was shown at trial. Additionally, there is not much, if any, contradiction. Many of Lewis's statements were concerned with drug shipments unrelated to the November 2001, and December 5, 2001, drug deliveries.

As to the alleged contradiction between Lewis and other witnesses regarding the number of cars used to store the cocaine, Lewis only testified to the number of cars which held cocaine the following morning. As noted in Part II, _supra_, Roy Bridges and Byron Knight stated that the cocaine was at one point stored in two automobiles. However, neither Ronald Knight nor Lewis knew exactly how or where Mr. Green had stored the cocaine prior to it being picked up. (Doc. 411 at 283, 486-91). Thus, the cocaine may have been moved at some point into one vehicle. Regardless, given the evidence at trial, such a minor discrepancy in testimony does

-23-

not demonstrate that counsel was unreasonable in choosing to avoid that line of questioning — especially given counsel's thorough cross-examination of Lewis.

Mr. Green also claims that several witnesses mistakenly referred to the break-room shared by others with his office.  (Id. at 10).  As will be discussed in this Court's review of Mr. Green's third claim of ineffective assistance of trial counsel, he fails to show that he was prejudiced or that counsel's tactical decision was unreasonable.

Finally, Mr. Green contends that his trial counsel erroneously argued during closing that Lewis had "lied" during his testimony.  (Id. at 10).  This alleged lie concerns counsel's belief that Lewis initially testified that Mr. Green helped unload the shipment of cocaine, but later testified on cross-examination that he never said that Mr. Green helped unload the tractor trailer.  (Id.). As previously noted, this Court read the portion of the transcript where Lewis testified that Mr. Green helped move equipment out of the way.  Thus, Mr. Green is correct that Lewis did not explicitly state that Mr. Green helped unload the cocaine.

Mr. Green, however, only speculates that his counsel's efforts to use this testimony as demonstrating that Lewis lied prejudiced the jury against him. Further, depending upon how one characterizes Lewis's testimony, he arguably contradicted himself, as Mr. Green's assistance could be construed as assisting in the

-24-

unloading. Regardless, by this argument, Mr. Green is simply pointing out that counsel's performance was not perfect. It is precisely this type of claim which a reviewing court should not find constitutes ineffective assistance of counsel.

### iii.   Byron Knight

Mr. Green alleges that his counsel failed to note inconsistencies between Byron Knight's PSR and trial testimony. Mr. Green claims that Byron Knight stated in his PSR that he met Mr. Green on the night of the marijuana shipment. As correctly noted by Mr. Green, no witness, including Byron Knight, testified that Mr. Green was present when the marijuana was delivered. Again, however, counsel made the reasonable decision not to raise this issue on cross-examination, as such a tactic might place in the jury's mind that Mr. Green was, in fact, present, when the jury had otherwise heard no testimony to that effect.

Mr. Green also claims that Byron Knight stated in his PSR that he did not remember much of the details of the November cocaine delivery, but he had a "marvelous memory" at trial. (Id. at 11). The record shows that Byron Knight only testified about a few details of the cocaine shipment. These details were that Byron Knight helped unload the cocaine, Mr. Green provided tools, and he helped remove the tractor trailer doors.

Instead of focusing on those details, counsel attempted to impeach Byron Knight by having him acknowledge that Ronald Knight provided him with a home and health care, and by going over Byron Knight's extensive mental illness history. Mr. Green does not attempt to explain how this tactical decision was unreasonable or prejudicial. Mr. Green is again relying on hindsight to argue that his counsel's performance fell short of perfection, and this Court does not find these alleged shortcomings, noted after the fact, to constitute ineffective assistance.

Mr. Green also notes that Byron Knight's PSR mentioned four de-briefings, but there was no D.E.A. 6 reporting such interviews. (Id. at 11). The record shows that this Court and the Government informed Mr. Green's counsel that there was no D.E.A. 6 report for Byron Knight, although the PSR indicated that one existed. (Id. at 671-73). Apparently, during the preparation of Byron Knight's PSR, there was confusion between Ronald Knight and Byron Knight, and Byron Knight was never debriefed by D.E.A. investigators. (Id. at 674). Accordingly, the discrepancy raised by Mr. Green was explained during trial and counsel, quite correctly, did not pursue the matter further.

iv.   Ronald Knight

Mr. Green attempts to argue that Knight's testimony was contradicted by Lewis's testimony and constituted perjury. (Doc. 546 at 12-13, 23). Specifically, Mr.

Green claims: (1) Knight said he did not arrive until after the cocaine was unloaded and was introduced to Mr. Green; (2) Knight did not recall a conversation concerning whether Mr. Green should be paid; (3) Knight did not remember whether Lewis told him Mr. Green wanted a kilo of the cocaine; (4) Knight did not see Mr. Green do anything with the cocaine or tractor trailer; and (5) Knight stated on re-direct that he did remember who provided the tools.[7] (Id.).

The only potential contradiction concerns Lewis's testimony that Knight was present when Mr. Green provided the tools to help remove the door. (Doc. 412 at 485). However, Lewis did not testify that Knight could see from his location that Mr. Green provided the tools. Additionally, Lewis testified that he and Knight left after the doors were removed to obtain vehicles for storing the cocaine. (Id. at 486-87).

The record is devoid of any evidence suggesting that either Knight or Lewis knowingly gave false testimony. Thus Mr. Green's claim that the Government knowingly used perjured testimony, or that either Knight or Lewis committed perjury, is without merit.

As the Government correctly notes, such minor discrepancies in testimony are to be expected. More importantly, this Court sees nothing unreasonable in counsel's

---

[7]The record shows that on re-direct Knight stated that he "couldn't have" been the one who provided the tools. (Doc. 411 at 453).

decision not to pursue this issue on cross-examination and in closing, as it would only reinforce Lewis's testimony regarding Mr. Green's participation in the cocaine distribution conspiracy. This view of counsel's tactical decision is supported by Mr. Green's failure to place much, if any, emphasis on the prejudicial effect of counsel's decision.

The remaining allegations about Knight's testimony simply show that he did not recall many of the details of the evening of the cocaine shipment. Such a failure does not show a contradiction, and this Court does not understand how counsel's failure to address this lack of recall would have bolstered Mr. Green's defense. In short, Mr. Green's allegations with regard to Knight's testimony do not satisfy Strickland.

b.    Summary

Mr. Green's first claim of ineffective assistance of counsel does no more than suggest that his counsel may not have made every possible argument or pursued every potential line of questioning. However, Mr. Green has failed to show that any of counsel's potential shortcomings had a material effect on the outcome of his trial. Accordingly, Mr. Green's claim that counsel was ineffective in his cross-examination of Government witnesses does not provide a basis for granting his § 2255 motion to vacate sentence.

2.   <u>Failure to Call Certain Witnesses</u>

Mr. Green alleges that trial counsel was ineffective by failing to call several potential witnesses.  (Doc. 546 at 14-15).  As correctly noted by the Government, "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess."  <u>Waters</u>, 46 F.3d at 1512; <u>Solomon v. Kemp</u>, 735 F.2d 395, 404 (11th Cir. 1984) ("While attorneys may disagree as to how many or what particular witnesses to call, such is the stuff out of which trials are made."); <u>Buckelew v. United States</u>, 575 F.2d 515, 521 (5th Cir. 1978)[8] ("complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative").  A review of the witnesses Mr. Green's counsel did not call to testify shows that there is no basis for making an exception to the general rule that "counsel's failure to call certain witnesses is not sufficient grounds for a Sixth Amendment claim." <u>United States v. Hughes</u>, 635 F.2d 449, 453 (5th Cir. Unit B 1981).

Lula Gilliam stated in her affidavit that she was prepared to testify that Mr. Green was an "honest" and "law abiding" person, and that Corey Lewis "will not

---

[8]In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the Fifth Circuit issued prior to October 1, 1981.

-29-

tell the truth if lying is of assistance to him."  (Doc. 546, Ex. 1).  Susan Moss stated in her affidavit that Mr. Green shared her "concerns about the dangers of drugs in the trucking business."  (Doc. 546, Ex. 2).  As shown in Part II, <u>supra</u>, Mr. Green's counsel had already presented character witnesses.  Counsel will not be found to have rendered ineffective assistance for failing to present cumulative evidence. <u>Turner v. Crosby</u>, 339 F.3d 1247, 1277 (11th Cir. 2003) (defense counsel in capital murder case not ineffective for failing to introduce cumulative mitigating evidence); <u>Waters</u>, 46 F.3d at 1512 ("counsel [not] required to present redundant evidence").

Mr. Green's long-term girlfriend, Laritha Ellis, was prepared to offer testimony which contradicted certain aspects of the testimony of Corey Lewis, Roy Bridges, and Ronald Knight.  (Doc. 546, Ex. 3).  For the most part, Ellis's testimony would have shown only minor discrepancies.  (<u>Id.</u>).  Significantly, it is questionable whether the most salient points of Ellis's affidavit would have resulted in admissible testimony, because she was offering to testify to matters she would not have personally witnessed unless she had been at Mr. Green's business during the drug deliveries.  (<u>Id.</u>).  In fact, in much of her affidavit, Ellis does no more than attempt to point out inconsistencies in the testimony of the Government's witnesses.  (<u>Id.</u>). Mr. Green does not even attempt to speculate as to what admissible testimony his

girlfriend would have given. There is, therefore, no basis for finding counsel's tactical decision not to call Ellis to testify unreasonable.

In Mr. Green's claim that trial counsel did not adequately prepare for trial, he alleges that counsel was ineffective by failing to call Marion Horn, Deborah Parker, and Kenny Peachy. (Doc. 546 at 16-17). As best as can be determined, Mr. Green alleges that Horn would have been a character witness. (Id. at 16). Again, such evidence would have been cumulative, and therefore, it was not unreasonable for counsel to choose not to have her testify.

According to Deborah Parker's written statement, a person cannot be locked inside Mr. Green's office. (Doc. 546, Ex. 4). Parker does not claim that a person could not be locked in the break-room, and Mr. Green has already pointed out that witnesses were confusing the office and the break-room. Further, counsel had already significantly impeached Roy Bridges. Thus, counsel was not unreasonable in deciding not to call Parker.

Peachy allegedly told Mr. Green that Bridges had told him that he was going to set Mr. Green up. (Id. at 17). Mr. Green does not present an affidavit or any other evidence to support his claim of what Peachy would have testified to at trial, and Roy Bridges's credibility was already impeached. Consequently, the purely

-31-

speculative nature of Peachy's testimony precludes a finding of ineffective assistance as a result of counsel's decision not to call him as a witness.[9]

Although the law seems clear that counsel's tactical decisions related to which witnesses to call does not amount to ineffective assistance, Mr. Green provides case law showing that in extreme cases a finding of ineffective assistance is justified when counsel fails to call certain key witnesses.  (Doc. 546 at 25-26).  None of the cases cited by Mr. Green are remotely applicable to his claim of ineffective assistance based on  his counsel's decision not to have certain witnesses testify.  See Code v. Montgomery, 799 F.2d 1481, 1483 (11th Cir. 1986) (counsel ineffective where "exclusive defense was based on an alibi" and counsel failed to subpoena "only potential defense witness"); Smith v. Wainwright, 799 F.2d 1442, 1444 (11th Cir. 1986) (counsel's failure to present evidence of another's exculpatory confession amounted to ineffective assistance); United States v. Paguio, 114 F.3d 928, 934-35 (9th Cir. 1997) (failure to admit statement under "unavailable witness exception for statements against penal interest" which exonerated defendant was reversible error, given that first trial resulted in hung jury); Williamson v. Ward, 110 F.3d 1508, 1522 (10th Cir. 1997) ("counsel's failure to investigate the circumstances surrounding [another's] confession left counsel unprepared to obtain the confession's admission

---

[9]As the Government correctly notes, Mr. Green does not show that Peachy was available and ready to testify on his behalf.

at trial and fell below an objective standard of professional reasonableness"); Bryant v. Scott, 28 F.3d 1411, 1418-19 (5th Cir. 1994) (counsel ineffective for not "making any investigation of alibi witnesses," not interviewing "eyewitnesses to the crime . . . [b]ecause there was no physical evidence" and failing "to interview codefendant . . . who confessed to the robbery and maintains that Bryant is not the other perpetrator of the crime"); Sanders v. Ratelle, 21 F.3d 1446, 1461 (9th Cir. 1994) (as "three of the state's five eyewitnesses at some point identified [another] as the shooter," counsel was ineffective for failing to present "the confession of a person who claimed to be and may have been the 'real' shooter"); Williamson v. Reynolds, 904 F. Supp. 1529, 1551-52 (E.D. Okla. 1995) (counsel ineffective for failing to bring out that state's primary witness had apparently avoided prosecution in an unrelated case by testifying against defendant and for failing to introduce videotape of another's confession to the crime), abrogated on other grounds by, Nguyen v. Reynolds, 131 F.3d 1340 (10th Cir. 1997).

Mr. Green's second claim of ineffective assistance of counsel fails to show that counsel's tactical decision concerning which witnesses to call was unreasonable and prejudicial. Accordingly, this claim of ineffective assistance of counsel does not warrant granting his § 2255 motion to vacate sentence.

-33-

3.    <u>Trial Preparation</u>

This Court has already concluded that counsel was not ineffective for failing to call Peachy, Parker and Horn as witnesses.  Mr. Green also alleges that counsel failed to adequately prepare for trial, in violation of the Sixth Amendment, in the following ways:  (1) lead counsel, Dwight Thomas, only met with Mr. Green twice prior to trial, but co-counsel, Teri Thompson, met with him "several times . . . during the approximate 2 weeks prior to trial"; (2) neither counsel "went over what he needed to explain to the jury in his own testimony"; (3) neither counsel discussed what testimony the Government's witnesses would provide or sought his assistance in challenging their testimony; (4) counsel waited until two weeks prior to trial to inform Mr. Green "what things needed to be done"; (5) counsel failed to take Mr. Green's advice concerning the inability to lock someone in the office or "to question agent McCrorey about threatening to prosecute Bridges"; (6) counsel did not "talk to him about how to rebut the evidence that was presented by the [G]overnment"; and (7) counsel failed to show pictures of the layout of Mr. Green's business, failed to have a private investigator describe the layout of the business, and failed to show a videotape of the business.  (Doc. 546 at 15-18).

A detailed review of these allegations of ineffective assistance of counsel is not warranted.  With one possible exception, Mr. Green does not even attempt to show

how he was prejudiced by counsel's allegedly inadequate preparation. For example, Mr. Green alleges that the evidence concerning the layout of his business "would have significantly highlighted the inconsistencies of the [G]overnment witnesses' version of events." (Id. at 18).  However, Mr. Green does not explain this alleged significance.  Therefore, although he uses more dramatic language with this claim of ineffective trial preparation, Mr. Green again fails to show even speculative prejudice.

Mr. Green does claim that, by showing that the break-room was being confused with the office, he could have been acquitted on the basis of "mere presence" because the break-room was used by multiple businesses. (Id. at 24-25). However, the evidence at trial does not show that any other businesses were operating at the time the cocaine and marijuana were delivered.  More importantly, the evidence at trial showed that Mr. Green was actively involved in the drug distribution conspiracy.  Thus, Mr. Green was not prejudiced by counsel's decision not to pursue the alleged confusion between the break-room and office.  Mr. Green's third claim of ineffective assistance of counsel does not satisfy Strickland.

### 4.    Possible Plea Agreement

Mr. Green contends that a letter from the Government indicated a willingness "to enter into a plea agreement with him," but counsel allegedly told him "not to

worry about that because I [Mr. Green] was not guilty."  Mr. Green does not claim he was prepared to admit his guilt, but he does allege that counsel never discussed the possibility of pleading guilty without admitting guilt, via <u>Alford</u>, 400 U.S. at 37-38 (a defendant may plead guilty while maintaining his innocence when there is a factual basis for finding that he is, in fact, guilty).  (Doc. 546 at 18-19).

The Government, however, maintains that, pursuant to USAM § 9-16.015, it would never enter into a plea agreement based on <u>Alford</u>.  (Doc. 551 at 25). Therefore, Mr. Green would not have been able to obtain a reduced sentence based on any agreement.  Further, Mr. Green does not attempt to show how he would have been entitled to a lower sentence for acceptance of responsibility.  "[T]he qualifications a defendant states in his guilty plea may be evidence that he has not fully recognized and accepted personal responsibility for the crime."  <u>United States v. Rodriguez</u>, 905 F.2d 372, 374 (11th Cir. 1990) (upholding district court ruling that denied defendant downward adjustment for acceptance of responsibility during entry of <u>Alford</u> plea, despite defendant stating at time of his arrest "that he may have done something wrong").

Further, "when a defendant casts doubts upon the validity of his guilty plea by protesting his innocence or by making exculpatory statements, the court may resolve such doubts against the plea."  <u>United States v. Gomez-Gomez</u>, 822 F.2d

-36-

1008, 1011 (11th Cir. 1987); see also United States v. Dykes, 244 Fed. Appx. 296, 298 (11th Cir. 2007) (relying on Gomez-Gomez to find that district court's rejection of defendant's Alford plea was not error).  Here, Mr. Green has not attempted to explain why his Alford plea likely would have been either (1) permitted by the government; (2) accepted by this Court; (3) resulted in an award for accepting responsibility; or (4) otherwise resulted in a lesser sentence.

In summary, Mr. Green has not shown that, even if accepted by this Court, pleading guilty pursuant to North Carolina v. Alford would have resulted in a lower sentence.  Thus, Mr. Green has again failed to show the prejudice required to demonstrate ineffective assistance of counsel.

## IV. Conclusion

Mr. Green's claims of ineffective assistance show, at most, that his trial counsel did not render perfect assistance.  However, Mr. Green has failed to meet his burden of demonstrating that counsel's performance was objectively unreasonable and prejudicial.  Accordingly, the instant 28 U.S.C. § 2255 motion to vacate, set aside, or correct sentence should be denied.

For the foregoing reasons, the instant 28 U.S.C. § 2255 motion to vacate, set aside, or correct the sentence [Doc. 546] is DENIED.

IT IS SO ORDERED, this 19th day of February, 2008.


s/Beverly B. Martin
BEVERLY B. MARTIN
UNITED STATES DISTRICT JUDGE